OPINION OF THE COURT
Jack M. Battaglia, J.
In two separate actions, Bertram V Crick and Elsa V Webb are seeking to recover from HSBC Bank USA (the Bank) the face amounts of four checks, totaling $31,500, that they delivered to Daniel Stern, an attorney, and that Mr. Stern deposited with the Bank. The indorsed complaint of Bertram Y. Crick, doing business as Val Crick’s Real Estate, states the nature and substance of the cause of action as “loss of money due to misappropriation of funds.” The indorsed complaint of Bertram V Crick and Elsa V Webb reads likewise, but adds “possible collusion” of the Bank with Mr. Stern. The indorsed complaints were filed by the respective plaintiffs before they were represented by counsel.
The four checks were issued in connection with the contemplated purchase and sale of several parcels of real property owned by sellers represented by Mr. Stern. One of the checks *1034 was drawn on an account maintained by Val Crick’s Real Estate with Chase Manhattan Bank, was payable to the order of “Slovak and Stern Esq.,” and shows an address on the “memo” line. The other three checks were drawn on one of the two accounts maintained by Ms. Webb with Dime Savings Bank of New York, were payable to “Slovak and Stern Esq.,” or “[unintelligible] Slovak — Stern Attorney,” and also show addresses on the “memo” line. One of the checks that is payable to “[unintelligible] Slovak — Stern Attorney” contains the words “down payment” above the address.
On the back of each of the checks, there is a handwritten signature, apparently made by the same person, that the parties treat as the signature of Daniel Stern. Under the signatures, there are stamped indorsements that read: “Pay to the order of HSBC Bank USA/For Deposit Only/Madison Importing, Inc.” Numbers appear below the Madison name, which, presumably, represent one or more accounts maintained with the Bank. The Bank presented the checks for payment to the respective drawee banks, which paid them, and the Bank then made the funds available to Mr. Stern through the Madison account(s). Mr. Stern obtained the funds, but did not apply them to the contemplated real estate transactions or deliver them to plaintiffs.
The Bank now moves for summary judgment in both actions, contending that “the only issues presented in the Complaint are those of law — i.e., whether the actions of HSBC in these matters was [szc] commercially reasonable or otherwise violated the New York Uniform Commercial Code,” and arguing that since “HSBC followed the instructions provided to it in the endorsements on the subject checks . . . , it is not liable for the Plaintiffs’ losses.” (HSBC Bank USA’s mem of law in support of its motion for summary judgment at 2, 3.) There are references in the papers to cross motions by plaintiffs, but no evidence that any notice of cross motion was filed or served, and none was calendared. Plaintiffs’ position, in any event, is that the Bank “acted in bad faith and departed from the reasonable commercial standards set by the UCC,” in that “the checks were issued to a law firm and therefore should have been deposited in the firm’s escrow account,” and that the Bank was required “to inquire about checks being deposited in account [szc] that belong to someone other than the payee.” (Affidavit in opposition to motion for summary judgment ¶¶ 10, 17, 19.)
First, the Bank makes no showing with respect to the plaintiffs’ claim for “possible collusion,” which the court *1035 understands as a claim of “commercial bad faith.” (See Prudential-Bache Sec. v Citibank, 73 NY2d 263, 273-277 [1989].) “As a general rule, a party does not carry its burden in moving for summary judgment by pointing to gaps in its opponent’s proof, but must affirmatively demonstrate the merit of its claim or defense.” (Mennerich v Esposito, 4 AD3d 399, 400 [2d Dept 2004], quoting Larkin Trucking Co. v Lisbon Tire Mart, 185 AD2d 614, 615 [4th Dept 1992].) Here, the Bank does neither.
No claim, of course, is established by the “possible,” and plaintiffs’ showing on these motions suggests that they may well not be able to prove the Bank’s “out-and-out dishonesty” or “complicity by principals of the [B]ank in . . . confederation with the wrongdoer[ ].” (See Prudential-Bache Sec. v Citibank, 73 NY2d at 274, 277.) The court recognizes the difficulty of establishing the absence of dishonesty in any entity that employs thousands of individuals, but the only admissible evidence submitted by the Bank on these motions consists of selected pages from the transcripts of plaintiffs’ respective depositions. Any deficiency in the papers of an opposing party is of no consequence when the moving party has not sustained its initial burden. (See Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985].)
As to plaintiffs’ claim for “misappropriation of funds,” the drawer of a check cannot sue a depositary bank when the check is paid by the drawee/payor bank even though the check is not “properly payable” (see UCC 4-401 [1]), as in the case of a check containing a forged indorsement, and the proceeds then made available by the depositary bank to its customer — the theory being that the drawee/payor bank has given its own funds to the depositary bank, so that the drawer has no interest in their disposition. (See Horovitz v Roadworks of Great Neck, 76 NY2d 975, 976 [1990]; Spielman v Manufacturers Hanover Trust Co., 60 NY2d 221, 224 [1983]; Underpinning & Found. Constructors v Chase Manhattan Bank, 46 NY2d 459, 463-465 [1979].) The rationale applies whenever the check is not “properly payable,” as in the case of missing indorsements (see Maldonado v Aetna Cas. & Sur. Co., 184 AD2d 553, 554-555 [2d Dept 1992]); or in the case of a forged drawer’s signature (see Insurance Co. of State of Pa. v Citibank [Del.], 145 AD2d 218 [1st Dept 1989]); or in the case of a material alteration (see Kings Premium Serv. Corp. v Manufacturers Hanover Trust Co., 115 AD2d 707 [2d Dept 1985]).
When, however, any irregularity in the check is nonetheless effective against the drawer so as to render the check “properly *1036 payable,” then the drawer’s funds are “in play,” and the drawer may sue the depositary bank that has acted wrongfully. (See Horovitz v Roadworks of Great Neck, 76 NY2d at 976; Spielman v Manufacturers Hanover Trust Co., 60 NY2d at 224-225; Underpinning & Found. Constructors v Chase Manhattan Bank, 46 NY2d at 465-466.) A depositary bank acts wrongfully when it disregards a restrictive indorsement. (See id. at 466-469; see also Sunset Park Redevelopment Comm. v Bowery Sav. Bank, 161 Misc 2d 344, 348-349 [Sup Ct, Kings County 1994], affd in part and revd in part on other grounds 224 AD2d 608 [2d Dept 1996].)
If the drawer has a cause of action against a depositary bank, it is a contract action for money had and received or a tort action for conversion. (See Underpinning & Found. Constructors v Chase Manhattan Bank, 46 NY2d at 461-462.) The Court of Appeals has also recognized that “possibly” there are other grounds (see id. at 464), and in the case of the bank’s disregard of a restrictive indorsement has spoken in terms of “normal commercial standards,” “due care and commercially reasonable behavior” (see id. at 469), which, of course, is the language of negligence.
With this legal backdrop, the court finds it curious that plaintiffs contend that the indorsements on the checks here were not effective, because the indorsement of “Slovak” was missing, whereas the Bank contends that the indorsement of Mr. Stern was effective as the indorsement of the law firm partnership. Neither party provides any evidence as to the juridical status of “Slovak and Stern Esq.” or “[unintelligible] Slovak — Stern Attorney.” For purposes of these motions, the court accepts the moving party’s position, favorable as it is to the nonmoving party.
The Bank relies heavily, with justification, upon Spielman v Manufacturers Hanover Trust Co. (60 NY2d 221 [1983]). The drawers there delivered a check to their attorney for transmittal to a law firm in settlement of pending litigation. The check was payable to the order of the law firm, but the drawers’ attorney forged the firm’s indorsement, and deposited the check with a restrictive indorsement into his own account. After determining that the forged indorsement was effective against the drawers (see id. at 224), the Court addressed the depositary bank’s conduct in crediting the attorney’s account as instructed by the restrictive indorsement.
“It is the direction to deposit to the account of the *1037 customer and the bank’s action in honoring that direction which . . . establishes that the bank’s action accorded with reasonable business practice for there are many instances in which a family member or a business may indorse for deposit funds to the credit of another and a depositary is not on notice of chicanery because of it nor is it liable if it faithfully follows such a direction.” (Id. at 228; see also Federal Ins. Co. v Manufacturers Hanover Trust Co., 157 AD2d 460 [1st Dept 1990].)
Here, there is no dispute that the Bank followed the instructions of the restrictive indorsement; indeed, that is precisely what plaintiffs are complaining about. The Bank apparently is of the view that, having complied with the indorsement, there can be no basis for liability to plaintiffs, or, put differently, that the only wrongdoing of a depositary bank that would permit an action by a drawer is failure to comply with a restrictive indorsement. But there is nothing in the case law that requires that conclusion, and applicable provisions of article 3 of the Uniform Commercial Code point elsewhere.
UCC 3-206 (3) provides that a transferee (other than an intermediary bank) under a restrictive indorsement “must pay or apply any value given by him for or on the security of the instrument consistently with the indorsement and to the extent that he does so he becomes a holder for value.” The provision continues that “such a transferee is a holder in due course if he otherwise complies with the requirements of Section 3-302 on what constitutes a holder in due course.” In addition to value, UCC 3-302 (1) (b) and (c) require that the instrument be taken “in good faith” and “without notice ... of any defense against or claim to it on the part of any person.”
There is notice of a claim against an instrument when the holder “has knowledge that a fiduciary has negotiated the instrument in payment or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty.” (UCC 3-304 [2]; see also UCC 3-206 [4].) Knowledge “that any person negotiating the instrument is or was a fiduciary” “does not itself give the purchaser notice of a defense or claim.” (UCC 3-304 [4].) “In any event, to constitute notice of a claim or defense, the purchaser must have knowledge of the claim or defense or knowledge of such facts that his action in taking the instrument amounts to bad faith.” (UCC 3-304 [7].) “A person . . . has ‘knowledge’ of a fact when he has actual knowledge of it.” (UCC 1-201 [25].)
*1038 From these statutory provisions, it seems clear that payment in accordance with a restrictive indorsement does not insulate a depositary bank from liability when it handles a check with knowledge of a breach of fiduciary duty, although establishing that knowledge may be difficult. What potentially distinguishes these two actions from Spielman is plaintiffs’ contention that the checks were payable to counsel in a fiduciary capacity, and that the Bank was sufficiently on notice that the fiduciary duty was breached. In Spielman, the attorneys to whom the check was made payable were not the drawers’ counsel, and the defalcating attorney was not a party to the check. The Bank appears to recognize the significance of these differences when it states that “[u]nless the Plaintiff[s] can prove HSBC was notified that Stern was not entitled to use the funds as he did, it cannot be liable to Plaintiffis] for Stern’s conversion.” (HSBC Bank USA’s reply mem of law at 3.)
Case law supports both the viability of a cause of action (apparently in negligence) by a drawer or beneficiary (in this case, plaintiffs would be both) against a depositary bank for a diversion of funds in breach of fiduciary duty, and the difficulty in establishing the bank’s liability. (See Matter of Knox, 64 NY2d 434 [1985]; Norwest Mtge. v Dime Sav. Bank of N.Y., 280 AD2d 653 [2d Dept 2001]; Home Sav. of Am. v Amoros, 233 AD2d 35 [1st Dept 1997]; Diller v Schick, 1998 WL 635539, 1998 US Dist LEXIS 14463 [SD NY, Sept. 16, 1998].) Assuming sufficient awareness of the fiduciary relationship, as in the case of fiduciary accounts, the applicable principles were recently reviewed by the Second Department:
“The general rule is that a depositary bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation . . . Liability may be imposed if a depositary bank has actual knowledge or notice that a diversion will occur or is ongoing. Facts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated will trigger a duty of inquiry on the part of a depositary bank, and the bank’s failure to conduct a reasonable inquiry when the obligation arises will result in the bank being charged with such knowledge as inquiry would have disclosed.” (Norwest Mtge. v Dime Sav. Bank of N.Y., 280 AD2d at 654.)
With respect to checks payable to a fiduciary, “there is no requirement that [the check] be deposited to a fiduciary ac *1039 count, and the fact that the instrument was not so deposited may not, without more, be relied upon as establishing a wrongful payment on the part of the depositary bank.” (Bradford Trust Co. v Citibank, 60 NY2d 868, 870 [1983].) Among the circumstances that may be relied upon are “any chronic insufficiency of funds, or any transfers to satisfy the fiduciary’s indebtedness” to the depositary bank (see Norwest Mtge. v Dime Sav. Bank of N.Y., 280 AD2d at 654; see also Diller v Schick, 1998 WL 635539, *2, 1998 US Dist LEXIS 14463, *6-7). When the claim proceeds on a negligence theory, there must also be proof of a requisite causal link between the bank’s conduct and the loss, as when “a reasonable investigation by the bank initiated at an earlier date would have uncovered [the] embezzlement.” (Home Sav. of Am. v Amoros, 233 AD2d at 42.)
The parties do not address the fiduciary cases, even though the alleged fiduciary relationship between Mr. Stern and plaintiffs has a central place in their claim. When the fiduciary cases are considered with those addressing a drawer’s action against a depositary bank, a number of serious questions arise. If the drawer’s claim is based upon a breach of fiduciary duty, is the action one for conversion or money had and received, as indicated in Underpinning, or one for negligence, as appears in the fiduciary cases? What if, as in this case, the drawer is also the beneficiary of the alleged fiduciary duty?
Recognizing the similarity, but not the identity, of the inquiries required in the negligence action and the requirements for holder-in-due-course status, how are the evidentiary burdens allocated between the drawer/beneficiary and the depositary bank? Although, of course, the plaintiff bears the burden of proving the elements of the cause of action, a bank bears the burden of proving holder-in-due-course status in the face of a claim based upon breach of fiduciary duty. (See D'Aureli v Bono, 284 AD2d 493, 493-494 [2d Dept 2001]; Fowler v Firth, 253 App Div 146, 150 [4th Dept 1938], affd 278 NY 683 [1938]; Citizens’ State Bank v Cowles, 39 Misc 571, 573 [Sup Ct, Westchester County 1903], affd 89 AD2d 281 [2d Dept 1903], revd on other grounds 180 NY 346 [1905].)
All of this assumes that the Bank was sufficiently aware of the alleged fiduciary status of the respective payees of the checks that it can be made to answer for failure to prevent a misappropriation of fiduciary funds. Questions arise, here too, about the standard against which to assess the Bank’s level of awareness. Specifically, is “actual knowledge” of a fiduciary relationship *1040 required, or will something less do? The decided cases do not explicitly address the question, and it is not one that need be answered on these motions.
None of the checks here was made payable to an attorney “as attorney for” the drawer or any third party. (See Maber, Inc. v Factor Cab Corp., 19 AD2d 500, 502 [1st Dept 1963]; see also Fowler v Firth, 253 App Div at 150 [draft payable to “(name), Executor”].) Although plaintiffs insist that “[t]he notation on the checks clearly and unequivocally states for down payment of the respective properties with their addresses” (affidavit in opposition ¶ 6), in fact only one of the four checks contains on the “memo” line the words “down payment” with an address.
Whatever standard is applied, including one of “should have known” that would be very favorable to plaintiffs, three of the checks at issue do not sufficiently identify the payees as a fiduciary, so as to engage any particular duty of care or vigilance on the part of the depositary bank. A check payable to an attorney is more likely to be intended for nonfiduciary purposes, such as payment of the attorney’s fee, than pursuant to a special relationship, and the addition of an address on the “memo” line adds little, even assuming that a bank will be charged with seeing it. At least when a depositary bank otherwise handles the check properly, paying the named payee in accordance with any restrictive indorsement, the check on its face establishes prima facie the bank’s freedom from fault. Plaintiffs point to no other evidence that the Bank here would have had sufficient awareness of a fiduciary relationship or purpose. (Compare Nealis v Industrial Bank of Commerce, 200 Misc 406 [Sup Ct, NY County 1951].)
The remaining check at issue, containing the additional words “down payment,” cannot be as easily set aside. Such a notation might well be understood as indicating a fiduciary relationship. (See Matter of DiMisa, 218 AD2d 441, 442, 444 [2d Dept 1996].) Assuming, now, the standard most favorable to the Bank, one of “actual knowledge,” it cannot be said that such a check on its face establishes prima facie the absence of sufficient awareness of a fiduciary relationship or purpose. That which appears on the face of a check can provide sufficient notice for purposes of determining holder-in-due-course status. (See Key Bank of Southeastern N.Y. v Strober Bros., 136 AD2d 604, 607 [2d Dept 1988].) As previously noted, the Bank has submitted no affidavit from a person with knowledge that addresses the facts of these actions, not even one containing a *1041 “conclusory allegation” of its freedom from wrongdoing. (See Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski v Republic Natl. Bank of N.Y., 160 Misc 2d 244 [App Term, 1st Dept 1994]; see also First Intl. Bank of Israel v L. Blankstein & Son, 59 NY2d 436, 444 [1983].) Given the subjectivity inherent in an “actual knowledge” standard, the absence of an affidavit is fatal on these motions to the Bank’s position with respect to the one check.
And the same applies to the ultimate issues concerning any wrongdoing on the part of the Bank in handling the “down payment” check. In light of the absence of a factual affidavit from the Bank, the little discovery that has been conducted so far, the failure of the parties to address some of the most pertinent case law, the serious and complex questions concerning the nature of any potential liability and its proof, and the importance of those questions to the banking system and all who rely upon it, the court determines that the resolution of the claim with respect to the one check should await further proceedings.
With respect to action No. 1, which does not cover the “down payment” check drawn by Ms. Webb and which does not assert a “commercial bad faith” claim, the Bank’s motion for summary judgment is granted, and the action is dismissed.
With respect to action No. 2, the Bank’s motion for summary judgment is granted to the extent that the action seeks damages for conversion, money had or received, or negligence for the Bank’s handling of the three checks that do not contain the “down payment” legend. The Bank’s motion is denied with respect to the “down payment” check, and to the extent that the action alleges “commercial bad faith” as to any of the four checks.